UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160(30) (NEB)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | GOVERNMENT'S SENTENCING POSITION |
| AMARJAH LESTER (30), | |
| Defendant. | |

*"Whether it be from violence with guns, drug sales, a combination of both, we have been preyed upon enough as a community."*

- Concerned Community Member Who Fears Retaliation.

For over 20 years, the Highs criminal enterprise attempted to hijack much of north Minneapolis. It indoctrinated youth, funded its operation by converting public spaces into open-air drug markets, and desensitized entire neighborhoods to the regular sound of machinegun fire. Highs members glorified the gang at the expense of any other consideration. It was more important to shoot a rival gang member on sight—be it a public place, a drive-by shooting, or at a well-attended party—than to worry about killing innocent bystanders. The Highs criminal enterprise is a scourge on public safety.

Defendant Amarjah Lester must answer for the role he played in the Highs' narcotics trafficking empire.[1] The whole here is much greater than the sum of its parts, and Lester's decision to facilitate the sale of the enterprise's contributed to the pervasive sense of fear,

---

[1] For each defendant in this matter, the government will simultaneously file a sealed letter to the Court outlining additional information regarding each defendant's broader role in the Highs criminal enterprise.

instability, and danger that has held north Minneapolis hostage for two decades. For his contribution to, and acceptance of, these realities, Lester's sentence must reflect the seriousness of the offense, promote respect for the law, and effectuate necessary deterrence. The sentence must also reflect Lester's relative involvement in the enterprise and his decision to accept responsibility for his actions.

## The Highs Criminal Enterprise

The Highs began laying claim to areas of north Minneapolis in 2004. Since that time, the Highs have dominated a large swath of north Minneapolis and its members have ruthlessly protected its turf. The Highs are engaged in a violent rivalry with the Lows. Each gang's moniker stems from its location—north or south—of West Broadway Avenue in Minneapolis:



*Figure 1: Overview of Highs and Lows Territories*

The May 2004 murder of Christopher Little, a known Lows member, proved to be a cataclysmic event in the history of the enterprise. Members of the Highs and Lows have

2

engaged in hundreds of shootings and murders in their territories since Little's murder, which only serves to restart the circles of violence and revenge. The victims of the violence were not only members or associates of the gangs, but also innocent adults and children who simply live within the gangs' territories.

Although the Highs enterprise consists of several "cliques," the gang's singular objective has remained the same: its members must "put in work" to promote, benefit, and enrich the gang. Highs members must commit acts of violence, procure firearms to facilitate the gang's activities, or engage in criminal activity such as fraud, robbery, or drug trafficking. The only other requirement is that members instill fear in rival gang members. Members of the Highs are expected to "hunt" rival gang members: an express directive to locate and kill rivals. Highs members also are expected to defend each other and to respond to any perceived disrespect from rival gangs. Highs and Lows gang members frequently take to social media to heighten their rivalry. Members of each gang post photographs trespassing in the other gang's territory or defacing the graves of murdered rivals. Highs members also frequently post images of themselves with money, drugs, and expensive items to gain respect. This glorification of gang life also serves to lure others into the lifestyle.

The Highs' existence depends on the success of the criminality of its members, which is comprised of a loosely defined and fluid hierarchy of (1) members who earned substantial respect from past criminality and receive a higher amount of the profits, host gatherings, and cover funeral expenses; (2) members focused on engaging in armed violent activity to protect Highs activities and target rival members; and (3) members focused on drug or weapons trafficking to further the ends of the criminal enterprise. Its members resort to any crime—

3

murder, kidnapping, arson, robbery, bribery, extortion, gambling, fraud, drug trafficking, arms dealing—so long as it glorifies the Highs enterprise or denigrates a rival gang.

Although its general credo has created violence in many parts of Minneapolis, a particular area within Highs territory acts as a representative microcosm of its activities. The Highs criminal enterprise runs rampant in the area of West Broadway and North Lyndale Avenue, including numerous businesses, and turned it into a de facto Highs headquarters:



*Figure 2: Intersection of West Broadway and North Lyndale Avenue in Minneapolis*

In fact, the Winner Gas Station has been openly referred to as "The Murder Station," "Murder Shop," or simply the "Murder," while the nearby Merwin Liquors and Walgreens have been

4

essentially open-air drug markets.[2]  The Highs stranglehold on this area has been so tight that its members do not hesitate to flaunt their illegal activities openly:



*Figure 3: Highs Member Flaunting Currency Outside Winner Gas in Highs Territory*

The sheer amount of gun violence, drug trafficking, and other illicit activity demonstrate the extent to which the Highs have damaged the community.  Between 2018 and 2023, in north Minneapolis alone—comprising both Highs and Lows territory—the statistics are staggering:

- 2,043 recovered firearms;
- 105 recovered switches;
- 7,997 "shots fired" calls;
- 20,265 ShotSpotter activations;

---

[2] This Walgreens location has since closed, in part due to the Highs activities in and around its location.  This is a representative example of how the enterprise can affect the economic health of communities.

5

- 1,151 gunshot victims; and
- 155 homicides

The plague of opioids—and particularly fentanyl, a prime Highs product—requires no introduction.  According to the Minnesota Department of Health, in 2022, Minnesota reported 4,228 non-fatal opioid-involved overdoses.[3]  Unfortunately, overdose deaths in Minnesota due to opioid misuse has skyrocketed from 342 in 2018 to 1,002 in 2022.[4]  Hennepin County alone experienced 378 opioid-related deaths in 2022, 94.7% of which were directly linked to fentanyl.[5]  Beginning in approximately 2020, the Highs began actively contributing to this epidemic when it transitioned from marijuana sales as its primary moneymaker to instead peddling synthetic opioids.

Put simply, instead of getting gas at the local station or picking up prescriptions at the neighborhood Walgreens, residents near Highs territory live with the fear of being robbed, shot with a machinegun during a gang-related shooting, or losing a loved one to a fentanyl-related incident.  The Highs criminal enterprise, fueled by the greed of its members and their thirst for power and respect, is a public health crisis.

## Amarjah Lester's Criminal Conduct

Defendant Amarjah Lester is a known associate of the Young n' Thuggin (YNT) subsect of the Highs criminal enterprise. ECF No. 1269 (PSR) at ¶ 16.  His "work" for the gang focused on drug trafficking and is directly tied to the Highs' narcotics distribution

---

[3] Minnesota Department of Health, *Drug Overdose Dashboard,* last accessed 2/6/2024 at https://www.health.state.mn.us/opioiddashboard.
[4] *Id.*
[5] Hennepin County, *Overdose Epidemic*, last accessed 2/6/2024 at https://www.hennepin.us/opioid.

activities, primarily through his close association with his now-deceased uncle, Damone Rhodes. *Id*. at ¶¶ 17-25. Key incidents include the following: in November 2021, he was twice observed engaging in suspected hand-to-hand drug transactions outside or near Rhodes's Mounds View residence. *Id*. at ¶¶ 17-18. That same month, he was arrested with Rhodes in a hotel room and a search recovered over $29,000 in cash, more than 1,000 oxycodone pills, two firearms, Promethazine, and additional drugs. *Id*. at ¶ 19. In February 2022, he and Rhodes were arrested following a traffic stop during which law enforcement recovered 356 fentanyl pills, marijuana, and $2,840 in cash from a vehicle. *Id*. at ¶ 20. And on May 11, 2022, during another traffic stop, officers recovered marijuana in plain sight and 550 fentanyl pills hidden in Lester's vehicle. *Id*. at ¶ 21. In total, Lester's conduct is linked to 1,289 oxycodone pills, 906 fentanyl pills, multiple quantities of marijuana and Promethazine, two firearms, and $46,929 in cash seized across multiple operations between November 2021 and May 2022. *Id*. at ¶¶ 17-25.

On November 8, 2023, a grand jury in this District charged Lester and numerous other Highs members in a Superseding Indictment with RICO conspiracy, drug trafficking, unlawful firearm possession, and other related offenses. ECF No. 450. On April 30, 2024, Lester pled guilty to engaging in a RICO conspiracy with the Highs criminal enterprise. ECF Nos. 985 (Plea Hearing). In doing so, Lester admitted to his involvement with the Highs criminal enterprise, his role as a drug trafficker for the benefit of the enterprise, and his responsibility for distributing at least 4 kilograms but less than 12 kilograms of fentanyl. ECF No. 987 (Plea Agreement) at ¶¶ 22-29.

## The Presentence Investigation Report

The Presentence Investigation Report (PSR) calculated Lester's Guidelines range at 97-121 months of imprisonment, based on a total offense level of 30 and a criminal history category of I. PSR at ¶ 49. This calculation includes a two-level dangerous weapon enhancement and a three-level minor role adjustment. *Id*. at ¶¶ 31, 34. The government agrees with the PSR's calculation of Lester's applicable Guidelines range.

## The Appropriate Sentence

The Court must impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a). For Lester, a significant custodial sentence as recommended by the government is appropriate considering his offense conduct, history and characteristics. The distribution of fentanyl, even in small quantities, poses an extraordinary risk to public safety.[6] Lester's involvement in the Highs' fentanyl trafficking operations directly contributed to the addiction and violence plaguing Minneapolis neighborhoods. These open-air drug markets, perpetuated by the Highs, fostered environments of lawlessness, marked by rampant gunfire and the degradation of community well-being. Lester was fully aware of the violence associated with the Highs' operations. Plea Agreement at ¶¶ 27-28. He not only jointly possessed firearms with a known Highs member, but he also acknowledged that firearms were a routine aspect of the gang's drug trafficking activities, increasing the likelihood of deadly confrontations. *See id*. This

---

[6] The United States Drug Enforcement Administration (DEA) estimates that "2mg [of fentanyl], the amount on the tip of [a] pencil, can be enough to kill an average American." *See* United States Drugs Enforcement Administration, *One Pill Can Kill*, last accessed 1/8/2025 at https://www.dea.gov/onepill.

8

"protection" often escalated into indiscriminate gunfire, leaving entire neighborhoods in fear. Despite being a victim of gun violence himself, Lester chose to perpetuate the cycle of harm, demonstrating a disregard for the safety of others. *See* PSR at ¶ 67.

Lester's offense conduct, while serious, was nevertheless limited in scope and duration than that of many of his co-defendants. Specifically, Lester's criminal acts consisted primarily of street-level and mid-level narcotics transactions tied to the Highs criminal enterprise through his uncle. *Id*. at ¶¶ 17-21. Unlike other Highs members, Lester was not a shot-caller, high earner, or leader in the enterprise. His role was as a participant in drug transactions, not as an architect of the gang's violence or broader criminal strategy. *Id*. The transactions attributed to him, though significant in aggregate, are discrete events tied to Rhodes's operations rather than evidence of an independent trafficking network. *Id*. The total quantities seized were substantial, but again they were seized in the context of Rhodes's larger-scale operation.

Lester's personal history also provides some context for his decisions, though it cannot fully excuse his adult conduct. Lester is a young man with minimal prior criminal history. PSR at ¶¶ 42-55. His sole felony conviction, for possession of a firearm with an altered serial number in 2021, resulted in a stayed sentence and probation. *Id*. at ¶ 45. He has no history of incarceration in the state prison system prior to this case. *Id*. at ¶ 109. His 21 months in pretrial detention have already marked the longest and most restrictive period of confinement in his life. *Id*. The PSR also reflects that Lester's background is one of instability and exposure to negative influences, including familial ties to entrenched gang activity. *Id*. at ¶¶ 58-74. His uncle's position in the Highs enterprise placed Lester in proximity to serious

9

criminal conduct from an early age. Importantly, however, there is no indication that Lester personally committed acts of violence on behalf of the gang, nor does the evidence suggest that he derived a leadership or managerial role from his association with Rhodes.

These mitigating factors, along with his decision to accept responsibility early, warrant some leniency. At the same time, Lester's actions as a willing participant in the enterprise's narcotics activities cannot be overlooked. A significant custodial sentence as recommended by the government will serve several important purposes. It will hold Lester accountable for his choices, send a clear message about the consequences of engaging in organized crime, and protect the community from further harm. The duration, scale, and destruction of the Highs' operations demand a strong response from the Court. Lester's sentence, along with those of his co-defendants, must reinforce the principle of collective responsibility for the harm caused by the enterprise.

Lester's participation in the Highs criminal enterprise has had devastating consequences for the community. While his personal history offers some mitigating circumstances, his decision to traffic fentanyl and facilitate gang violence underscores the need for a serious penalty. A significant custodial sentence is necessary to reflect the seriousness of the offense, promote respect for the law, and deter others from similar conduct. It is imperative that Lester understand the significance of his choices, and a significant custodial sentence will serve the goals of specific and general deterrence. The duration, breadth, and destruction of the Highs criminal enterprise is unparalleled in the Twin Cities. The Court's sentence, and all those that follow, must send the important message that *each*

member of the Highs bears collective responsibility for how the enterprise impacted the community at large.

## Conclusion

For all these reasons, the government respectfully submits that its recommended custodial sentence fully comports with the United States Sentencing Guidelines and the factors of Title 18, United States Code, Section 3553(a).

Dated: August 14, 2025　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　JOSEPH H. THOMPSON
　　　　　　　　　　　　　　　　　　Acting United States Attorney

　　　　　　　　　　　　　　　　　　*/s/ Albania Concepcion*

　　　　　　　　　　　　　　　　　　Albania Concepcion
　　　　　　　　　　　　　　　　　　Attorney ID No. 0401536
　　　　　　　　　　　　　　　　　　Assistant United States Attorney